# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RICKY MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 3113 |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant City of Chicago's (City) motion for summary judgment. For the reasons stated below, we grant the motion for summary judgment.

## BACKGROUND

Plaintiff Ricky Martinez (Martinez) indicates that he is a Muslim male of Middle-Eastern origin. Martinez alleges that on December 2, 2006, he applied for a job as a probationary police officer (PPO) with the Chicago Police Department (Department). Martinez claims he passed the "power test," the written exam, and psychological tests. On January 16, 2007, Martinez was allegedly interviewed at

1

home for the PPO position.  During the interview, Martinez allegedly disclosed that

he had been arrested on charges of aggravated assault in connection with a traffic

violation, but that the charges were dropped on the condition that he serve six months

of supervision.  After the interview, Officer Julie Alexander-Fallon (Fallon), who

conducted the interview, allegedly told Martinez that she believed that since he had

not been convicted, Martinez's prior arrest would not prevent Martinez from

qualifying for the job.  Fallon further allegedly indicated that she thought Martinez

would get the job.  Martinez also claims that he truthfully and completely explained

his prior employment with Global Relief Foundation (GRF), an Arab and Muslim

charitable organization.  Martinez allegedly told Fallon that GRF had been shut down

due to suspected terrorist ties and that he had cooperated completely with

investigators.  Martinez also contends that Fallon asked for copies of his passport in

order to run a background check through Interpol even though allegedly such checks

were not ordinarily performed for applicants for such positions.

On May 3, 2007, Martinez called the Department and was informed that he

had been rejected for the job because he had a prior driver's license suspension.

Martinez then claims to have spoken with another member of the Department who

told Martinez that he did not get the job because of his prior arrest.  The individual

also allegedly indicated an incorrect belief that Martinez had been convicted in

relation to the aggravated assault offense. Martinez contends that other non-Muslim, non-Arab applicants were hired by the Department that had arrest records.

In May 2008, Martinez allegedly received a rejection letter (Rejection Letter) from the Department and the letter inaccurately represented that Martinez had been convicted of aggravated assault. The Rejection Letter also allegedly stated that Martinez had falsely indicated on his applicant questionnaire (Questionnaire) that: (1) he had not been convicted of a crime, (2) he had never been questioned by police, (3) he had never given testimony in a criminal court as a defendant, and (4) he had provided truthful statements on the Questionnaire. Martinez claims that: (1) he was never convicted on the aggravated assault charges and instead received supervision, (2) he did not understand the word "questioned by police" in the Questionnaire to include questioning by the Federal Bureau of Investigation, which had questioned him on a prior occasion, and (3) although he had been a defendant in a criminal case, he had never spoken in court and he had answered "no" in good faith to the question regarding testimony in a criminal case. (Compl. Par. 40). The Rejection Letter also allegedly informed Martinez that he had been rejected for the position because: (1) he had failed to register with the Selective Service System, (2) he had $250 in unpaid parking tickets in the Village of Bridgeview, and (3) he had three prior driver's license suspensions. Martinez claims that he believed that he was exempt from

registration because at the time he was not a United States citizen. Martinez claims that he paid the parking tickets sometime before he received the Rejection Letter in 2008. Martinez claims that despite Fallon's assurances that Martinez would get the job, the Department rejected Martinez and gave shifting reasons for the rejection. Martinez also contends that it took a year after his rejection to get the Rejection Letter, and that such a delay indicates a discriminatory intent. Martinez contends that he was rejected for the job because of his national origin and religion. The City now moves for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence

of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).


## DISCUSSION

A plaintiff bringing a Title VII discrimination claim can defeat a defendant's motion for summary judgment under the direct or indirect method of proof. *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

I.  Direct Method of Proof

The City argues that Martinez cannot proceed under the direct method of proof.  A plaintiff can proceed under the direct method of proof utilizing direct or circumstantial evidence.  *Rhodes*, 359 F.3d at 504.  Generally, direct evidence consists of "an admission by the decision-maker that his actions were based upon the prohibited animus."  *Id.* (internal quotations omitted).  A plaintiff can also proceed under the direct method of proof utilizing circumstantial evidence "by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker."  *Id.* (internal quotations omitted)(quoting in part *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994)(stating that "circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action")(internal quotations omitted).

In the instant action, Martinez has not pointed to any direct evidence of unlawful discriminatory animus towards him.  For example, Martinez points to statements such as an alleged statement by Sergeant John Fumo that: "the Titanic already left . . . I can't bring it back." (SAF Par. 86).  Martinez asks the court to accept the inference proposed by Martinez that the statement by Fumo masked a hidden discriminatory meaning.  Martinez has also not pointed to sufficient

circumstantial evidence to create a convincing mosaic of circumstantial evidence.

Martinez's contentions of discriminatory treatment are not, for example, premised

upon any statements directly referencing his national origin or religion.  Martinez

mainly relies upon inferences drawn from what he deems suspicious and inconsistent

explanations for his rejection and his belief that the Department was aware of his

religion, national origin, and involvement with GRF.  We recognize that in certain

instances, "suspicious words or actions," "suspicious timing," or "ambiguous

statements" can suffice for the direct method of proof.  *Hossack v. Floor Covering

Associates of Joliet, Inc.*, 492 F.3d 853, 861-62 (7th Cir. 2007)(quoting in part

*Troupe*, 20 F.3d at 737).  However, Martinez has not pointed to sufficient

circumstantial evidence of such instances to proceed under the direct method of

proof.  Martinez admits that "[n]o one at the [Department] told Martinez that he was

not going to be hired because his religion is Muslim, and no one at the [Department]

made any remarks to him about his religion."  (R SF Par. 46, 56).  We also note that

Martinez does not present any arguments indicating that he can prevail utilizing the

direct method of proof and only presents arguments under the indirect method of

proof.  (Ans. 3).  Thus, Martinez cannot proceed under the direct method of proof

even when considering the totality of the evidence.

## II.  Indirect Method of Proof

The City contends that Martinez has not pointed to sufficient evidence to defeat the City's motion for summary judgment under the indirect method of proof. Under the indirect method of proof, a plaintiff has the burden to establish a *prima facie* case.  *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009).  If a plaintiff establishes a *prima facie* case under the indirect method of proof, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the action.  *Id.*  If the defendant meets that burden, the burden shifts back to the plaintiff to show "'that there is an issue of material fact as to whether the employer's proffered reasons are merely pretext for unlawful discrimination . . ., in order to survive summary judgment.'" *Id.* (quoting *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004)).  For the indirect method of proof in a failure to hire Title VII case, "a plaintiff must present evidence tending to show that: (1) [h]e was a member of a protected class; (2) [h]e applied for, and was qualified for, an open position; (3) the employer rejected h[im] for the position; and (4) the employer filled the position with an individual outside of the plaintiff's protected class, or the position remained vacant." *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1110 (7th Cir. 2004).  The City argues that, although Martinez applied for an open position, he was not qualified for the open position and that Martinez has not

pointed to sufficient evidence of pretext.

A. Application Process

The City argues that the undisputed evidence shows that Martinez was not qualified for the open PPO position based on a series of reviews by independent Department employees during the application process. The following facts concerning the PPO application process are undisputed facts:

(1) The City's Department of Human Resources (DHR) administers the first step of the application process. Applicants who successfully complete written examinations are placed on an eligibility list by the DHR. The DHR, Investigations Section (Investigations Section) receives the eligibility list and conducts the remaining steps in the application process. (R SF Par. 8).

(2) The Department's Bureau of Administrative Services Special Order No. 97-2, Background Standards for Application to the Position of Police Officer, dated February 1, 1997, (Background Standards) sets forth certain criteria for consideration in regard to assessing whether a PPO applicant is eligible for hire based on his or her background and gives certain guidance for background investigations during the application process. (R SF Par. 9).

(3) Each PPO applicant is required to complete a Personal History Questionnaire (PHQ), which the Investigations Section uses as a starting point for background investigations. (R SF Par. 10).

(4) An investigator (Investigator) is assigned by the Investigations Section to investigate a PPO applicant's background, which includes a preliminary interview at the applicant's home, verification of statements on the PHQ, and a review of the applicant's criminal history. After the Investigator completes his or her assigned tasks, he or she prepares a closing report (Closing Report). (R SF Par. 11, 13).

(5) The Closing Report and a file containing all documents obtained during the investigation, including the PHQ, are forwarded to multiple supervisory personnel in the Investigations Section. The supervisors then review the documents, prepare a Candidate Review Worksheet, and make

recommendations regarding the PPO application.  (R SF Par. 14).

(6)    All documents, including the recommendations are referred to the Commanding Officer of the Investigations Section.  If the Candidate Review Worksheets contain a recommendation to reject the PPO applicant, the Commanding Officer prepares a Summary Report.  (R SF Par. 15).

(7)    All documents are forwarded to the Commander of DHR, Division for Review (Commander).  If the Commander concurs with the recommendation of rejection, the Commander forwards to the Deputy Superintendent of the Department Bureau of Administrative Services, all documents with a letter including a notification that the applicant does not meet the background standards and recommending that the applicant be removed from the eligibility list.  (R SF Par. 17).

### 1.  Initial Investigation and Closing Report

Martinez indicates that Fallon was assigned to conduct the initial interview and background investigation for Martinez.  Martinez contends that Fallon conducted an Interpol check on Martinez, and that such act shows discriminatory treatment. Martinez disputes what circumstances necessitate an Interpol check by the Department of applicants born outside the United States.  (R SF Par. 28).  However, even if we accept Martinez's contention that Fallon was not following a standard practice at the Department, Martinez merely points to evidence that shows that there was no standard practice relating to Interpol checks.  (R SF Par. 28).  Martinez does not present any evidence indicating that Fallon conducted an Interpol check based upon a discriminatory intent.

Martinez also contends that after Fallon completed the home investigation,

Fallon told Martinez: "You're fine, Ricky. You meet everything. Your arrest, don't worry about it, because it's such a long time that you were arrested, in 1991. You did not lie about it in the application, and it was not a conviction." (R SF Par. 30). Martinez contends that Fallon assured Martinez that the Department would call him within two months to let him know he could attend the police academy. (R SF Par. 30). However, whether or not Fallon made such statements has little bearing on the ultimate resolution of Martinez's application. As Martinez acknowledges, the Investigator's role is to prepare a Closing Report and the Investigator does not make any decisions concerning the hiring of a PPO applicant. (R SF Par. 11, 30). Thus, even if Fallon gave certain assurances to Martinez, Fallon had no authority to make the ultimate recommendations or hiring decisions, and there is no other evidence that the Department employees that evaluated Martinez's application had any input from Fallon other than her Closing Report. (R SF Par. 31).

### 2. Supervisory Evaluation and Candidate Review Worksheet

Martinez acknowledges that the Closing Report and investigation documents for his application were forwarded to Sergeant Paul Gregoire (Gregoire) and then Sergeant Anthony Carothers (Carothers), who were supervisory employees in the Investigations Section. (R SF Par. 31). Martinez acknowledges that Gregoire and

Carothers each prepared a Candidate Review Worksheet for Martinez, indicating that Martinez should be rejected due to his failure to meet the Background Standards. (R SF Par. 32, 35). Martinez acknowledges that Gregoire claimed that Martinez did not meet the Background Standards due to: (1) his failure to register for Selective Service System, (2) his two driver's license suspension, (3) the two civil judgments, one of which was a collection account, and (4) his placement on supervision for an aggravated assault. (R SF Par. 33). Martinez also concedes that Carothers concluded that Martinez did not meet the Background Standards due to: (1) the supervision for the aggravated assault offense, (2) driving on a suspended license, (3) failure to appear in court relating to the suspended license offenses, and (4) the failure to register for the Selective Service System. (R SF Par. 35).

### 3. Summary Report

Martinez acknowledges that the Candidate Review Worksheets were then forwarded to Sergeant John Fumo (Fumo), Commanding Officer of the Investigations Section. (R SF Par. 14, 36). It is undisputed that Fumo then prepared a Summary Report, recommending that Martinez be removed from the eligibility list. (R SF Par. 36). Martinez acknowledges that the Summary Report included reasons such as: (1) the arrest for aggravated assault, (2) the driver's license suspensions for

failure to appear in court in 2001 and 2003 and the citation for operating a motor vehicle while having a suspended license, (3) the failure to register for the Selective Services System, (4) the collection account for $250 in unpaid parking tickets, and (5) the failure to accurately answer the questions on the Questionnaire. (R SF Par. 37). Martinez also acknowledges that Fumo testified that Fumo considered Martinez's placement on supervision for the aggravated assault to be a conviction because such a sentence is a punishment for stipulating to the facts of the offense. (R SF Par. 38). Martinez argues that another deposed Department employee testified that a sentence of supervision does not necessarily equate to a conviction. (R SF Par. 38).

### 4. Commander of Division of Review

It is undisputed that Fumo submitted the investigation documents and Summary Report to Lieutenant Cathleen Rendon (Rendon), Acting Commander of the DHR, Division of Review. (R SF Par. 40). Martinez acknowledges that Rendon concluded that Martinez did not meet the Background Standards and that his application should be rejected. (R SF Par. 40). It is undisputed that Rendon did not recall any conversations with Fallon, Gregoire, Carothers, or Fumo regarding Martinez's application. (R SF Par. 40).

## 5. Deputy Superintendent

Martinez admits that Rendon forwarded the documents relating to Martinez's application along with a recommendation of rejection to Theodore O'Keefe, the Department Deputy Superintendent of the Bureau of Administrative Services. (R SF Par. 40). Michelle Burton, the Acting Commissioner of the DHR informed the DHR that Martinez should be removed from the eligibility list. (R SF Par. 41). Martinez acknowledges that he subsequently received a rejection letter from the DHR. (R SF Par. 42).

Martinez argues that the delay in receiving his rejection letter evinces unlawful discrimination. However, the City contends that in mid 2006, the Investigations Section was instructed to stop the process of forwarding PPO Applications to the Commander of the DHR. (SF Par. 20-22). The City contends that the appeals process for applicants disqualified under the Background standards was under review until early 2008. (SF Par. 20). Martinez does not dispute such facts, but points out that applicants rejected based on reasons other than the Background Standards received rejection letters during that time period. (R SF Par. 20). Thus, Martinez does not provide any justification for considering the delay in his rejection based on the Background Standards to be unusual or suspicious.

### B.  Whether Martinez was Qualified for the PPO Position

The City argues that Martinez was not qualified under the Background Standards for the PPO position.  The City points to the many reasons relied upon by the Department employees involved in the application review process.  In regard to the allegedly inaccurate statements included on the Questionnaire, Martinez has presented a variety of explanations for his answers to show that he did not make any errors in bad faith.  For example, he contends that he did not understand the word "questioned by police" in the Questionnaire to include questioning by the Federal Bureau of Investigation, which had questioned him on a prior occasion.  He also claims that although he had been a defendant in a criminal case, he had never spoken in court and he had answered "no" in good faith to the question regarding testimony in a criminal case.  While such belated explanations are issues of credibility, Martinez still has not offered a sufficient explanation for the other reasons for his rejection.

### 1.  Selective Service System

Martinez acknowledges that one reason for his rejection was his failure to register for the Selective Service System.  Martinez presents a lengthy explanation for the failure to register.  However, he does not show that he could not or should not

have registered. He merely pleads ignorance of the law and misunderstandings. (SAF Par. 75). He has not pointed to evidence to show that his failure to register could not be taken into consideration in assessing his application. Martinez contends that the Selective Service System is not specifically referred to in the Background Standards. (SAF Par. 60). However, the Background Standards does not indicate that it includes an exhaustive list of specific reasons that an applicant can be rejected. (SAF Par. 59). Martinez acknowledges that the Background Standards indicate generally that considerations include the applicant's "criminal conduct," and "respect for the authority of law." (SAF Par. 59).

### 2. Unpaid Parking Tickets

Martinez also acknowledges that his $250 in unpaid parking tickets and the fact that he had an account in collection were reasons for his rejection. Martinez does not dispute that at the time of his application process he had such unpaid parking tickets. He contends that he had financial difficulties and could not pay the parking tickets. However, Martinez fails to explain why the existence of the unpaid parking tickets was not a legitimate reason to reject his application. Martinez also contends that he paid off the parking tickets before he received the Rejection Letter in 2008. (Ans. 7). However, Martinez does not assert that he paid off the parking

tickets before being informed by phone of the rejection or that he paid them off

before the application process was concluded.  Martinez acknowledges that the

Background Standards mention consideration such as the applicant's indebtedness

and lack of respect for the authority of law.  (SAF Par. 59).


### 3.  Criminal Record

Martinez argues that he does not have a sufficient criminal record to disqualify

him under the Background Standards.  He asserts that he only received supervision

for the aggravated assault instead of a conviction.  However, he fails to show that a

sentence of supervision as opposed to a dismissal of charges or nolle pros on the

charges, is not a sentence that could be considered in assessing his respect for the law

under the Background Standards.  We note that there is legal support for Fumo's

belief that a supervision should be deemed a conviction.  *See, e.g., United States v.*

*Jones*, 448 F.3d 958, 959 (7th Cir. 2006)(concluding that prior sentences of

supervision in Illinois state court constituted convictions for the purposes of criminal

history points during sentencing).  Martinez also offers various explanations for what

happened in regards to his license suspensions and his failure to appear in court.  He

contends that the type of offenses relating to his driving record are not specifically

referenced in the Background Standards as a basis for disqualification.  However, as

stated above, Martinez has not pointed to any evidence that shows that the Background Standards purport to provide an express and exhaustive list of circumstances that warrant disqualification. Martinez's placement on supervision for the aggravated assault and the criminal proceedings regarding his driving records were valid bases under the Background Standards to disqualify him. Based on the above, the undisputed evidence shows that Martinez was not qualified for the PPO position. Thus, Martinez has failed to establish a *prima facie* case.

Martinez also contends that the Background Standards were applied to him in a discriminatory manner. Although Martinez has compared himself to other applicants, he has failed to show that such applicants were similarly situated to Martinez. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)(indicating that a similarly situated employee "is someone directly comparable to [the plaintiff] in all material respects"); *see also Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008)(stating that the "similarly situated inquiry is a flexible, common-sense comparison"); *Antonetti*, 563 F.3d at 592 (referring to similarly situated employees in regards to discipline). For example, Martinez compares himself, with his aggravated assault arrest, to an individual that was hired by the Department who had an arrest for battery. However, Martinez did not show that such individual's background also included the various other additional reasons

for rejection as did Martinez's background.


C.  Reason and Pretext

The City contends that it rejected Martinez's application since he did not meet the Background Standards for the PPO position.  Thus, the City has provided a legitimate non-discriminatory reason for its decision.  Martinez contends that the reason is a pretext.  A reason given by an employer for not hiring a plaintiff is "pretextual when it is a lie-a phony reason meant to cover up a disallowed reason" and "[o]therwise, an employer's decision to favor one candidate over another can be mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005)(internal quotations omitted)(stating that "[a] plaintiff shows that a reason is pretextual directly by persuading the court that a discriminatory reason more likely motivated the [defendants] or indirectly by showing that the [defendants'] proffered explanation is unworthy of credence").  In the instant action, Martinez points to what he deems to be shifting explanations for his rejection.  He contends that the individuals he spoke to at the Department and the various documents prepared during the application process did not provide the exact same list of reasons for the rejection of his application.  However, Martinez has not

pointed to any sources that provided inconsistent reasons for a rejection. He

contends that Fallon indicated at the initial stage of the process that Fallon believed

that Martinez would pass the Background Standards, but Fallon admittedly could not

make any such decision. There is, in fact, nothing remotely suspicious about the

various differing lists of reasons for Martinez's rejection. *See Simple v. Walgreen

Co.*, 511 F.3d 668, 671 (7th Cir. 2007)(finding pretext requirement met based on

"inconsistent explanations"). Martinez has not shown that any of the explanations

given to him were purely subjective or arbitrary reasons pulled out of thin air. The

undisputed record amply indicates a solid foundation and documentation for each of

the reasons for rejection that were given to Martinez. (R SF Par. 58). There were

many potential reasons for Martinez's rejection and the various individuals

reviewing his application and those informing him of his rejection could have

reasonably cited some of the different reasons for his rejection. Martinez points to

no evidence that would reasonably allow an inference that there was a coverup or

hidden motives behind the given reasons for his rejection.

Martinez also has not pointed to adequate evidence for a reasonable trier of

fact to find any hidden motives in view of the several layers of review and

recommendations by different employees at the Department. Martinez now attempts

to provide lengthy explanations for his answers on the Questionnaire relating to his

background. However, the Department's decision to reject Martinez's application was based upon his answers, background, and lack of qualifications. Martinez has not shown that the Department made up a phony reason in rejecting his application. The Seventh Circuit has made clear that the "[p]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is lie, specifically a phony reason for some action" and "in assessing a plaintiff's claim that an employer's explanation is pretextual," the federal courts "do not sit as a super personnel review board that second-guesses an employer's facially legitimate business decisions. . . ." *Argyropoulos*, 539 F.3d at 736 (internal quotations omitted). In addition, we note that the Department has a legitimate interest in conducting proper background checks of applicants for sensitive positions, such as that of a police officer.

Martinez also points to statements allegedly made by Fumo. In 2004, on a prior occasion when Martinez applied for a PPO position, Fumo allegedly told Martinez to merely retake the tests and Martinez would "be fine." (SAF Par. 68). However, there was no alleged assurance that Martinez would meet the Background Standards. Martinez also argues that he was discriminated against because of his involvement with GRF. He contends that since GRF was a Muslim organization, and the Department was aware of his involvement, the Department had reason to

conclude that he was a Muslim as well. Even if we accepted Martinez's premise that the Department was aware of his religion, Martinez has failed to point to any evidence that would reasonably suggest any discrimination tied to GRF or Martinez's religion. Martinez argues, for example, that he construed a statement allegedly made by Fumo that: "the Titanic already left . . . I can't bring it back," to mean that Fumo was not going to overturn the recommendation for a rejection due to Martinez's involvement with GRF. (SAF Par. 86). Martinez has not shown that a reasonable inference from such a statement would be of discriminatory intent. Martinez also contends that Fumo, during his deposition, initially attempted to conceal his knowledge of Martinez's involvement with GRF. However, Martinez has failed to point to sufficient evidence to indicate an intent to conceal matters. Martinez also contends that Ahmed Gutale (Gutale), Chairman of the United African Organization, met with Fumo and Fumo allegedly told Gutale, that Martinez's rejection "may have had something to do with" GRF. (SAF Par. 87). Even if such a statement was made, it would merely be a speculation and does not nullify in any way the effect of the other layers of review of Martinez's application and the several reasons for the rejection of Martinez's application.

Martinez also contends that in 2007 he telephoned Rendon to discuss his application and Rendon told Martinez "we're never going to hire you, no matter what

you do." (R SF Par. 52). However, as Martinez concedes, the alleged statement made by Rendon was in response to arguments presented by Martinez as to why he satisfied the Background Standards. (R SF Par. 52). There is no evidence from which to reasonably conclude other than that Rendon was indicating to Martinez that, since he did not meet the Background Standards there was no way he could be hired as a PPO. Martinez also references an alleged comment made by the Tracey Ladner (Ladner), the Department Personnel Director, that the Department should "check on" Martinez since he worked for GRF. (R SF Par. 52). However, there is no evidence that Ladner was involved in the hiring process. (R SF Par. 52-53). Martinez has thus not pointed to sufficient evidence of pretext even when considering the totality of the evidence. Therefore, we grant the City's motion for summary judgment.

## CONCLUSION

Based on the foregoing analysis, we grant the City's motion for summary judgment.


_Samuel Der-Yeghiayan_
_____
Samuel Der-Yeghiayan
United States District Court Judge


Dated:   August 11, 2009